I PATRICIA RIVET MURRAY, Judge.
This is an action by a subcontractor against, among others, the general contractor to recover the balance due on a subcontract for work performed as part of an office renovation project. The central issue presented by this appeal is whether the subcontractor preserved its claim and privilege under the Private Works Act, La. R.S. 9:4801-55, by timely filing its state *449 ment of claim -within the applicable sixty-day period under La. R.S. 9:4822(C). The trial court decided this issue in favor of the plaintiff-subcontractor on summary judgment. For the reasons that follow, we reverse and render summary judgment on the defendant-contractor’s cross-motion in its favor, dismissing this action.
FACTS
Continental Common, Inc. (“Continental”) is the owner of a thirty-one story office building and a fourteen-story annex located at 1010 Common Street in New Orleans. On March 8, 1999, Continental entered into a lease agreement with Actel Integrated Communications, Inc. (“Actel”) for office space located on the thirteenth floor of its annex building (the “Suite”). Before moving into the Suite, Actel contracted with Delta Contractors of New Orleans, Inc. (“Delta”) to perform certain leasehold improvements; those improvements were referred to as a “Build-jOut”.», of the Suite. Delta then sub-contracted with SSEM Corporation (“SSEM”) to install a fire protection package in the Suite. In May 1998, SSEM contracted with C & S Safety Systems, Inc. (“C & S”) to install an FM-200 fire suppression system in the Suite.
An FM-200 system is a dry sprinkler system that extinguishes fire by discharging a chemical onto the surface of com-busting materials. It is designed for use in areas where a sprinkler system is undesirable. Actel needed the FM-200 system installed in the area of the Suite where it planned to house extremely expensive electronic equipment (the switch room) so as to protect that equipment from the water damage a sprinkler system could cause. The installation agreement provided that the FM-200 system would be integrated into the building’s fire detection and control network. The agreed upon price for the design and installation of the FM-200 system was $75,000.
Although Actel paid Delta the amount due for the improvements to the Suite and Delta paid SSEM for its work, including the amount due for the design and installation of the FM-200 system, SSEM failed to pay C & S. As a result, on November 9, 1999, C & S filed a statement of claim and privilege against BHNO Partners, Ltd. (apparently Continental’s predecessor) and Actel, as Owners, under La. R.S. 9:4806, and Delta, as Contractor, in the mortgage records for the Parish of Orleans to preserve its lien and privilege under the Private Works Act. The statement of claim asserts a debt of $75,000, based on C & S’s two invoices totaling $75,000 — one dated June 8, 1999 for $50,000, the other dated July 12, 1999 for $25,000. The statement of claim describes the work done as installing an FM-200 system, “including detection and panels, abort and manual activation stations, discharge piping, smoke detectors, strobe lighting and alarms, and wiring |,.¡together with related materials, equipment and labor.” The statement of claim describes the property as the building located on 1010 Common Street in New Orleans. On November 16, 1999, C & S filed an Amended and Restated Statement of Claim and Privilege listing Continental Common and Actel as Owners and Delta as Contractor.
On January 7, 2000, C & S filed this suit against SSEM, Continental, Actel, and Delta seeking to recover the balance due of $75,000. After suit was instituted, SSEM made one payment of $42,750 to C & S, which reduced the outstanding principal balance to $82,250. SSEM’s payment was made pursuant to a June 20, 2000 Forbearance Agreement and Consent Judgment, which provided for judgment in C & S’s favor against SSEM in the amount of $85,500. Although the agreement pro *450 vided for payment in two installments of $42,750 each to be made on or before June 30, 2000, and July 31, 2000, respectively, SSEM paid only the first installment and refused to pay the second one. C & S then filed a motion for partial summary judgment against SSEM based on the Forbearance Agreement, which was granted. Due apparently to its inability to collect on the judgment against SSEM, C & S pursued Delta and Actel for the remaining balance due.
Shortly before the scheduled May 2002 trial date, a hearing was held on the cross-motions for summary judgment filed by C & S and Delta.[1] The principal issue addressed on the cross motions was the timeliness of C & S’s filing of its statement of claim. Apparently finding C & S’s statement of claim was timely filed, the trial court granted C & S’s motion for summary judgment and denied |4Pelta’s cross-motion without assigning reasons. The trial court thereafter rendered a final judgment in favor of C & S and against Delta in the amount of $32,750 plus interest, attorney’s fees, and costs. This appeal by Delta followed.
ANALYSIS
On appeal, the standard of review of a trial court’s decision granting summary judgment is de novo. Shelton v. Standard/700 Associates, 2001-0587, p. 5 (La.10/16/01), 798 So.2d 60, 64-65; Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 26 (La.7/5/94), 639 So.2d 730, 750. We ask the same questions as the trial court asked; to wit: whether there is any genuine issue of material fact, and whether the mover-appellee is entitled to judgment as a matter of law. See La. C.C.P. art. 966(C). In answering these questions, we are guided by the Legislature’s admonition that “[t]he summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action” and that “[t]he procedure is favored and shall be construed to accomplish these ends.” La. C. Civ. Pro. art. 966(A)(2). We also are guided by the Louisiana Supreme Court’s recent pronouncement that “despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent’s favor.” Willis v. Medders, 2000-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050.
Tracking the federal rule, Federal Rule of Civil Procedure 56, the Louisiana summary judgment article, La. C.C.P. art. 966(C), “is designed to allow courts to decide whether enough evidence exists to go to trial, thus giving judges an opportunity to weed out meritless litigation.” Oakley v. Thebault, 96-0937, p. 4 (La.App. 4 Cir. 11/13/96), 684 So.2d 488, 490. Summary judgment should only | Bbe granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits establish that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Conversely, summary judgment should be denied if (1) there is a genuine issue of fact, and (2) it is material to the case. Smith, supra.
In determining whether a “genuine” issue exists, “courts cannot consider the *451 merits, make credibility determinations, evaluate testimony or weigh evidence.” Smith, 93-2512, p. 27, 639 So.2d at 751. An issue is “genuine” if reasonable persons could disagree. Id. A fact is “material” to the case if it is one “that would matter on the trial of the merits.” Id. In making that materiality determination, courts must look to the applicable substantive law underlying the plaintiffs cause of action. See Carter v. Baver, 2002-0765, p. 4 (La.App. 4 Cir. 5/29/02), 821 So.2d 496, 498.
C & S’s claim against Delta is based solely on the Private Works Act. Recently, we summarized the two basic rights that Act affords a subcontractor, stating:
The Private Works Act was enacted to facilitate construction of improvements on immovable property and does so by granting to subcontractors, among others, two rights to facilitate recovery of the costs of their work from the owner with whom they lack privity of contract. The first right is a statutory “claim”— the right to personally sue the owner for the amount that is owed — that is provided by La. R.S. 9:4802(A)(1); particularly, this statute provides that subcontractors have a claim against the owner and a claim against the contractor to secure payment of the price of their work. The second right is the privilege provided by La. R.S. 9:4802(B), which states that “[t]he claims against the owner shall be secured by a privilege on the immovable on which the work is performed.”
Montz v. Conco Constr. Co., 2002-0195, p. 6 (La.App. 4 Cir. 7/24/02), 824 So.2d 498, 502. Given the special nature of the two rights the Act confers, the | (¡jurisprudence holds that those rights must be strictly construed against subcontractors and in favor of the owner and contractor, and requires strict compliance with the Act’s statutory requirements. Montz, 2002-0195 at p. 7, 824 So.2d at 503 (citing Metropolitan Erection Co. v. Landis Constr. Co., 627 So.2d 144 (La.1993)). The subcontractor (here C & S) has the burden of proving its statement of claim was timely filed; unless the subcontractor meets this burden it cannot avail itself of any of the rights provided under the Act. Id.; Marshall Achord Elec. Contractor v. Zeagler, 527 So.2d 51, 53 (La.App. 3d Cir.1988). Stated otherwise, any right a subcontractor would have had under the Act is lost if it fails to timely file a statement of claim to preserve that privilege as required by La. R.S. 9:4822(A) or (C). Montz, supra.
Because neither a notice of contract nor a notice of termination was filed in the mortgage records, C & S had sixty days from the date the work was substantially complete to file its statement of claim under La. R.S. 9:4822(C).[2] Given that C & S filed its initial statement of claim on November 9, 1999, both sides agree that C & S’s statement of claim was untimely only if substantial completion occurred before September 10, 1999. The narrow issue is when did substantial completion occur.
By statute, “substantial completion” is defined by La. R.S. 9:4822(H), which provides the following disjunctive definition of that term:
*452 |7A work is substantially completed when:
(1) The last work is performed on, materials are delivered to the site of the immovable or to that portion or area with respect to which a notice of partial termination is filed; or
(2) The owner accepts the improvement, possesses or occupies the immovable, or that portion or area of the immovable with respect to which a notice of partial termination is filed, although minor or inconsequential matters remain to be finished or minor defects or error in the work are to be remedied. (Emphasis supplied).
Construing this provision, the courts have held that it establishes two discrete dates from which the time for filing the statement of claim begins to run; to wit:
(1) on the date the last work is performed or the last materials are delivered to the site or (2) on such earlier date when the owner accepts the improvement, possesses or occupies the property if only minor or inconsequential matters remain to be finished or minor defects or errors in the work are to be remedied.
Southmark Corp. v. Ellis Millwork, Inc., 535 So.2d 507, 509 (La.App. 2 Cir.1988). “[WJhere the owner occupies the premises, but significant items of work remain to be done, substantial completion does not occur until the unfinished work is completed, that is, the date the last work is performed or materials delivered as described in Subsection (1) of Section 4822(H).” South-mark, 535 So.2d at 510. “Occupancy of the property does not trigger the beginning of the period for filing liens if major or consequential construction items are unfinished or major remedial work remains to be done.” Id.
Conversely, if the only work remaining on the date the owner occupies the premises is minor “punch list” items, substantial completion occurs on that date. E.C. Durr Heavy Equipment, Inc. v. National Tea Co., 538 So.2d 1104, 1106 (La.App. 5 Cir.1989). As a commentator points out, the reference to “minor or | smconsequential matters” in Section 4822(H)(2) is equivalent to “punch list” items; a “punch list” is simply “a euphemism for minor and inconsequential matters that need to be completed.” Michael H. Rubin, Ruminations on the Louisiana Private Works Act, 58 La. L.Rev. 569, 594 (1998).
In this case, Actel began occupying the Suite no later than July 8, 1999 when its representative signed a document entitled “Acceptance/Lease Commencement Notification,” which designated July 1, 1999 as the date of: (i) its acceptance of the lease space “as is,” (ii) Continental’s turning over the Suite, (iii) its occupancy, and (iv) the commencement date of the lease and rent. The question to be resolved is whether on that date the unfinished items were “minor or inconsequential” or “major or consequential.” Delta contends it is the former; C & S contends it is the latter.
Delta contends that the only work performed on the Suite after July 8, 1999 fell into two categories: (i) new work (i.e., work that was not part of the original Build-Out of the Suite) or (ii) “minor or inconsequential” work as contemplated by Section 4822(H)(2). C & S counters that it is a common practice for lessees to take possession and to begin using a budding before construction has been completed, citing Albert K. Newlin, Inc. v. Weingarten’s Markets Realty Co., 253 So.2d 594, 597 (La.App. 3 Cir.1971) and Southmark, supra. Continuing, C & S argues that such is the case here since when Actel took occupancy of the space in July 8, 1999 the *453 FM-200 system was not operational, essential work remained to be done, and the state fire marshal’s approval had not been obtained.
In support of its motion for summary judgment, C & S offered affidavits from a corporate representative, Rodney Co-meaux, and from a deputy assistant secretary with the state fire marshal, Mark Gates, who both attested that:
|n« Installation of a FM-200 system is not considered substantially complete and the system is not authorized for use until state fire marshal certification is obtained;
• It is not uncommon for the state fire marshal to require additional work on a fire suppression system before signing off on a certificate of completion; and
• The FM-200 system in the Suite had neither been inspected nor certified by the state fire marshal as of April 2002, the time they executed their affidavits.
Mr. Comeaux additionally attested that:
• Under the standards of the fire protection industry a fire suppression system is not substantially complete until it can save life and property and has been tested and certified by the appropriate governing authorities, which here is the state fire marshal;
• Under the contract between SSEM and C & S, installation of the FM-200 system shall not be deemed substantially complete until the system has been tested and certified by the state fire marshal’s office;
• Critical to the proper functioning of the FM-200 system is its integration into the building’s existing fire detection and control network;
• Proper integration requires that all other contractors working on elements that may impact the FM-200 system complete their work before C & S finalizes and fully tests the system, and final testing before that point would be premature; and
• C & S’s final activities would include: “connecting the fire suppression cylinders to make the system operable, integrating the building’s fire alarm system into the FM-200 system, and integrating the FM-200 system into Actel’s security system.”
According to C & S, from May 1999 to July 1999 it performed work on the FM-200 system and left the job in July 1999 because it had done all the work it could up to that point. C & S claims that it had to await SSEM’s completion of the sprinkler system as well as other work, such as HVAC and electrical work, before it could complete integrating and final testing of the system and before it would be ready for inspection by the state fire marshal. C & S additionally claims that both it and other contractors performed work on the Suite after July 8, 1999 and that the | ^subsequent work it performed was essential. Particularly, Mr. Comeaux attested that on both October 14-15, 1999, and December 29, 1999, C & S was called back to perform original work (not corrective work) that could not be performed in July 1999. He stated that in October 1999, C & 5 was allowed to tie-in the flow and tamper switches of the wet sprinHer system to the FM-200, which work was required for the FM-200 system to properly function and which was an essential part of the work as defined by the installation specification. In December 1999, it reconnected some of the installations that were made in October and conducted some of the programming of the system. According to Mr. Comeaux, as of December 1999, the FM-200 system was not operational, and as of the date of his affidavit, April 2002, C 6 S had neither completed programming *454 the FM-200 system nor done the full function test of the system.
Delta contends that the fact that repair work was required to be performed on the FM-200 system after July 8, 1999 did not necessarily preclude the project from being substantially complete upon Actel’s occupancy of the Suite. In support of that position, Delta cites the deposition testimony of the building’s property manager, Tanjha Stoll, which it introduced in support of its cross-motion for summary judgment.
Ms. Stoll testified that the Suite was “second generation” space, which means it was previously occupied by a tenant and had walls, carpet, ceilings, lights, doors and locks, as opposed to “first generation” space, which is an unfinished shell. Describing the Build-Out of the Suite, she stated that:
Walls were knocked down and reconfigured, ceiling was replaced, lights were installed, electrical was installed, HVAC was reconfigured. The sprinkler system was already in place. The sprinkler lines inside the switch room were changed out to a dry system [the FM-200 system] from a wet system, floors were installed.
| nAccording to Ms. Stoll, the Build-Out work on the Suite commenced in April 1999, shortly after the lease was signed, and was completed in July 1999, when Actel took possession. During that interval, SSEM was contemporaneously completing the installation of the sprinkler system for the entire building pursuant to its separate agreement with Continental; and, during that interval, Continental was leasing space in the building pursuant to a variance from the state fire marshal. Explaining the variance, Ms. Stoll stated that when Continental acquired the building in March 1998, it had no sprinkler system. Thereafter, the state fire code was amended to require that all high-rise buildings in New Orleans have a sprinkler system installed by the end of 1999. Although Continental contracted in good faith with SSEM to install a sprinkler system in its entire building, SSEM could not complete that work by the end of 1999. For that reason, Continental obtained a variance from the state fire marshal for the entire building.
Although Actel took possession and occupancy of the lease space in July 1999, Ms. Stoll testified that a certificate of occupancy was not issued by the City of New Orleans at that time because the building was operating under the variance;[3] specifically, she stated:
At the time the build-out was going on and we were rehabbing the building, we were in the process of a complete life safety upgrade, so we had a blanket permit on the entire property while we were trying to comply with code issues for sprinkler work and fire alarms and things of that nature. We did not do a certificate of occupancy because the sprinkler system was not certified at that time. We were working on it under a variance.
She clarified that it was a matter of sequencing “everything under one roof.”
lnAs to the sprinkler system work on the Suite, Ms. Stoll explained that Continental and its property management company had input into selecting SSEM as the subcontractor for the sprinkler system work in the Suite for two reasons. First, since the sprinkler system for the entire budding was still not certified and *455 approved by the state fire marshal, the entire system was “technically SSEM’s system;” hence, SSEM was the only one “authorized to be installing the system and working on the system until it was 100 percent completed and inspected.” Second, if another contractor were hired to work on the system, it “could compromise the integrity of that system, make it so that they couldn’t get an inspection or cause other problems.”
Although the state fire marshal did not issue the final certificate of occupancy for the entire building until September 2001, Ms. Stoll testified that the delay in obtaining the state fire marshal’s approval for the building was unrelated to any of the work performed on the Build-Out of the Suite; rather, that delay was attributable to work undertaken by SSEM pursuant to its separate contract with Continental. As of July 1, 1999, she stated that both the sprinkler system and the fire suppression system in the Suite were complete. On cross-examination, however, she acknowledged that she just assumed the fire suppression system was functioning and that she had no personal knowledge of whether it was operational. Nonetheless, she testified that the only large-scale, major construction work performed on the Suite after July 8,1999 was some reconfiguring of an office that was done in 2000, which was not encompassed in the Build-Out of the Suite. She further testified that the only other work performed on the Suite after July 8, 1999 involved either correcting punch list items or addressing problems with the fire protection system and the alarm. Ms. Stoll testified that since Actel took | ^occupancy during the first week of July 1999 the Suite has continuously been occupied.
C & S’s focus solely on the point at which the installation of the FM-200 system was completed as determining the crucial date on which substantial completion occurred is misplaced. Substantial completion is a Private Works Act concept, not a contractual concept. Indeed, as noted earlier, the Act affords a subcontractor, like C & S, rights against a contractor, like Delta, despite the lack of privity of contract between them. As a result, the proper focus in determining substantial completion under the Act is on the entire construction project.[4] In this case, the project was the Build-Out of the Suite, and installation of the FM-200 system was only one aspect of that larger project.
In support of its contention that substantial completion of the Build-Out occurred on July 8, 1999, Delta stresses that by July 12, 1999, C & S had billed SSEM for 100% of the contract price. Delta additionally stresses that the Forbearance Agreement between SSEM and C & S declares that “after completion of the work, C & S Safety Systems, Inc. invoiced SSEM Corporation for the amount due and owing, $75,000.00.” (Emphasis supplied).
On the other hand, C & S contends that substantial completion legally could not have occurred either at the time of occupancy or any time before it filed its statement of claim because the state fire *456 marshal’s office approval had not yet been obtained. C & S stresses that under the contractual installation specifications, the fire protection industry customs, and state fire marshal mandates, an FM-200 lusystem is not substantially complete until it has been inspected and certified by the state fire marshal. C & S thus argues that the “last furnishing of services or materials” under Section 4822(H)(1) could not reasonably be found to have occurred until the state fire marshal inspected and approved the FM-200 system. C & S’s position is that when (as here) an act of construction must be inspected and approved by a local governing authority (here, the state fire marshal), substantial completion does not occur until such approval has been obtained; in support of that position, C & S cites Shreveport Long Leaf Lumber Co. v. Spurlock, 9 La.App. 224, 120 So. 126 (2 Cir.1928) and Rex Elec. Co. v. Glorioso, 19 La.App. 712, 140 So. 236 (2 Cir.1932).
Contrary to C & S’s position, substantial completion is not indefinitely prolonged pending testing or inspection. Instead, when testing or inspection is a requirement, such testing or inspection is simply a fact to be considered in determining when the work is completed; it is not controlling in making that determination. Chambers v. Zeigler, 207 So.2d 262 (La.App. 1 Cir.1968). Indeed, “[w]here a test or inspection is involved the facts are important in determining the issue.” Janice T. Martin, Comment, Laborers’ and Materialmen’s Privileges under Louisiana Building Law, 44 Tul. L.Rev. 326, 339 (1970).
Illustrative, in Electric Contracting Co. v. Brown, 39 So.2d 100 (La.App. 2 Cir. 1949), the plaintiff performed electrical work on the defendants’ house and completed the work on March 10th; however, with the city’s electrical inspector’s approval, the plaintiff used a ground clamp that did not meet the requirements of the Alexandria city ordinance because a proper one was unavailable. The clamp 1^plaintiff used worked, and the defendants began using the electrical fixtures after March 29th. On April 25th, the plaintiff returned to the job and installed a ground clamp that complied with the ordinance. On June 13th, plaintiff filed a lien. Claiming the lien was timely filed within the sixty-day window, the plaintiff argued that the job was incomplete until the proper clamp was installed. Disagreeing, the court reasoned:
Under these circumstances, we think the holding of the Court in the case of Hortman-Salmen Company, Inc. v. White, 168 La. 1067, 123 So. 715, is applicable and, as stated by the Court in that case, the last labor is done and the last service or material is furnished, within contemplation of the lien statute, when the building is treated as completed and the correcting of defects which may appear from time to time in the work after the building is considered and treated as completed, is not to be considered or deemed as part of the labor contemplated by the statute in fixing the time. Otherwise, as the Court in that case observed, the time within which to record liens might linger indefinitely and the rank of mortgages and other claims against the property might be displaced unreasonably.
39 So.2d at 101-102.
Although the Hortmam-Salmen decision was decided in 1929 and although the Legislature has since amended the statutory definition of substantial completion, the official revision comments to La. R.S. 9:4822(H) expressly state that the Legislature did not intend to change the law. See Official Comment (h) to La. R.S. 9:4822 (stating “[n]o substantial change in the law *457 is intended. ’) Applying those principles here, we find that the lack of the state fire marshal’s approval of the FM-200 system was simply another fact to be considered in determining whether the Build-Out of the Suite was substantially complete as of July 8,1999.
C & S apparently contends that substantial completion occurred not only after July 8, 1999 (the date of Actel’s occupancy), but also (if at all) sometime after |1fiit filed its statement of claim. Accepting C & S’s argument would mean that the sixty-day delay never began to run because it filed its statement of claim before substantial completion occurred. This argument raises the res nova issue of whether a claim can be filed before the sixty-day period commences to run. Suggesting that perhaps a claim filed too early is equally as invalid as a claim filed too late based on the statutory language that the claim must be filed “within” sixty days of substantial completion, a commentator notes that the courts apparently have never addressed this issue. Michael H. Rubin, Ruminations on the Louisiana Private Works Act, 58 La. L.Rev. 569, 591-92 (1998). In this case, however, we find it unnecessary to resolve that issue as we find C & S failed to establish the crucial date of substantial completion.
Establishing the date on which substantial completion of the project occurred is an essential element of a subcontractor’s claim under the Private Works Act because by statute that date marks the commencement of the lien period. La. R.S. 9:4822(C). C & S’s failure to establish that date results in an inability to establish the timeliness of its claim. For that reason, the trial court erred in granting summary judgment in C & S’s favor.[5] For that same reason, we further find that the trial court erred in failing to grant Delta’s cross-motion for summary judgment.
|17DECREE
For the foregoing reasons, we reverse the trial court judgment granting summary judgment in favor of C & S, and grant summary judgment in favor of Delta on its cross-motion, dismissing this action.
REVERSED AND RENDERED.

. At this juncture, the dispute is solely between C & S and Delta. C & S originally sought summary judgment against Delta and Actel. Actel was dismissed from the case by judgment dated January 23, 2002, apparently because of its bankruptcy filing. Continental also filed a motion for summary judgment against C & S that was heard on that same date as the cross-motions filed by C & S and Delta; the trial court denied that motion.

. La. R.S. 9:4822(C) provides a sixty day period when:
Those persons granted a claim and privilege by R.S. 9:4802 for work arising out of a general contract, notice of which is not filed, and other persons granted a privilege under R.S. 9:4801 or a claim and privilege under R.S. 9:4802 shall file a statement of their respective claims and privileges within sixty days after:
(1) The filing of a notice of termination of the work; or
(2) The substantial completion or abandonment of the work, if a notice of termination is not filed.

. We note that the record contains a Certificate of Completion issued by the City of New Orleans Department of Safety and Permits for the installation of mechanical equipment in the Actel lease space on the 13th floor., which is dated July 21, 1999.

. Although the Private Work Act contains provisions that permit an owner to divide a project into parts and to declare partial completion, those provisions are not at issue in this case. Nonetheless, those provisions evidence the Legislature’s view of the Act as applicable to an entire construction contract absent the owner availing itself of these special provisions. See Janice T. Martin, Comment, Laborers' and Materialmen’s Privileges under Louisiana Building Law, 44 Tul. L.Rev. 326, 330 (1970)(noting that owner’s selection of how to proceed under the Private Works Act controls which provisions of the Act apply and results in “the rights and duties of a laborer or materialman differing].”)

. Although Delta also assigns as error C & S’s improper designation of the property covered by the lien as the entire building as opposed to Actel’s leasehold interest, we do not reach that issue as we find summary judgment was inappropriately granted on another basis.